The next matter is No. 25-1282, Nicholas Galakatos v. Marsh & McLennan Companies, Inc., et al. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin? Good morning, Your Honors. I'm David Farrell. I represent Nicholas Galakatos, and I request a minute for rebuttal. You may have a minute. May it please the Court. The reason to vacate the dismissal here is best shown on page 2 of the Memorandum in Order, that's Addendum 22. The indented portions of quotes, the top one being paragraph 17 of the amended complaint and the bottom, paragraph 31. These quotes are truncated and ellipsized and eliminate any reference to excess gaps, and there's no resemblance to each other when in fact the two paragraphs are almost identical. That's precisely the type of parsing that's prescribed by Ocasio-Hernandez, admonished in Hernandez-Cuevas v. Taylor, and it's amplified by a total absence of any reference whatsoever to paragraph 22 of our complaint, which is what we call the keystone, which ties together the 2018 policies. As a result, the amended complaint was not read as a whole. Reasonable inferences were not given to Mr. Galicados. In essence, what we have is a promise to eliminate excess gaps, which was not fulfilled because Marsh breached in paragraph 35, its obligation to add the Galani primary policy to the AIG policy, which was to cover Mr. Galicados anywhere in the world. So as I understand, and correct me if I'm wrong, if I understand the applicable substance of law, a broker normally does not have any fiduciary duties to suggest additional coverage even though they may do so, but if you hire an advisor to advise you on what type of insurance you need and what risks you have, then you may have such duties. And so we turn here, you're sort of behind the eight ball to start out because this seems at least putatively to have the trappings of a broker relationship, but you say that may be the case, but it's a 12-year relationship, and then you point to a paragraph, which seems to me to be your best point, a notice sent out by Marsh that refers to tell us about all your properties and risks so that we can advise you, and there you go, aha. They offered to be our advisor if we would tell them the risk, and I told them about the vote. And they also promised to eliminate any gaps. In that same missive. Right. But then I saw, I looked, I said, well, did they say that before the loss? Yes. And I find nothing in your complaint to indicate, in fact, you seem to step around when they made that assertion. Oh, chronologically, it preceded even the purchase of the Galani. The court found that it was prior to the loss. We're dealing with a 12 v. 6, are you saying you don't have to in the complaint place this chronologically, or are you saying we can infer a date somehow? It was chronologically in the complaint prior to the underlying accident, and I think that the inference can be taken that that was before the boat was bought. The same language is used prior to the underlying collision and after the underlying collision, showing a years-long bargain. Bargain? It's the prior to, I'm having difficulty finding in your complaint, unless I assume that every allegation in the complaint is set forth in sort of videotape of events in chronological order. It was. That's the way I. Because your brief itself just says at some date Marsh told him in writing the following. But it was prior to the collision. Counsel, the collision was in September of 2018, right? Yes, it was. Okay. So looking at paragraph 17, which you emphasize, there's no date at all as to when that communication took place. It's a description of the communication. You assert, I gather, here, it's not part of the record, that that communication that you emphasize took place before September 2018. How are we supposed to know that? I mean, the court, in his decision, the court notes that deficiency. That's a pretty serious problem, isn't it? I just think that the complaint. Excuse me, but if that's after the accident, it's meaningless in terms of the theory that you're advancing here, isn't it? The date was in 2014. We said that there was no annual reviews for four years. That would put it at 2014. It was an annual review, that comment that's made about advice and elimination. It's the exact advice and elimination in paragraph 31, and it was four years before that in 2014 that it was last made. So that puts it before the Gihanni was purchased by inference. We do say in paragraph 30 that the last time they had any conferences, any communication on this was four years before. Isn't there also law for the proposition that this kind of communication in paragraph 17, even if it predated the accident, that kind of communication does not constitute a contract. They're just communicating back and forth about information that would be important for them to have, but to portray that as a contract seems to be just inconsistent with the law. Well, Your Honor, it's a mutual obligation. Mr. Galicados has to identify a primary risk, and in return, Marsh is going to eliminate any excess gaps in that. It's only natural if he were to buy $20 million in excess coverage that he would expect that Marsh would obtain that coverage for him when they placed the boat policy anywhere in the world under the AIG policy, and Mr. Galicados reasonably expected that. It does predate, and we noted in a footnote that the motion to strike, if we'd had a chance to respond, we would have brought up. These same comments were made in 2011, 2012, I think it's 2013 and 2014. They pre-existed, and they predated the loss, and they were ratified by the paragraph 31, same language. This was the agreement that he had with Marsh, and they failed to add it. Let me ask you a quick choice of law question. Is it your contention that if we don't consider the documents attached in the motion to dismiss, Massachusetts law applies here? Yes. And there were three cases stated from New York that were miscited in the memorandum to Mr. Galicados' detriment. Thank you. Thank you, counsel. At this time, would counsel for the appellees please introduce herself on the record to begin? Good morning, Your Honors, and may it please the Court. Jocelyn Scherr from Okefarr and Gallagher on behalf of the Marsh defendants, the appellees, and with me today is Lorraine Feldman, in-house counsel at Marsh USA. Your Honors, the insurance that Mr. Galicados specifically requested was procured by the Marsh defendants. Mr. Galicados says that himself in paragraphs 19 to 21 of the amended complaint. And as he says in his opening brief, page 27, there was no need to obtain another policy. Those are his words. And I did not hear anything from my colleague Mr. Farrell say anything to the contrary when he stood up just now. His statements acknowledging that the Marsh defendants got exactly what he asked for are completely opposite of what he's saying in his amended complaint, that the Marsh defendants breached contractual and tort duties owed to him to get adequate liability coverage for the Galani, his yacht in Greece. And he said they had to get up to $20 million specifically. He does not allege any contractual terms in his amended complaint that required the Marsh defendants to get insurance in that amount for the Galani specifically. And it is contrary to Massachusetts law. Well, under Massachusetts law, is there any reason a broker can't say, look, I know I'm a broker, so normally I know no duties, but I'm telling you, client, that if you do X, I will give you advice on how to avoid gaps in your insurance. Wouldn't that give rise to an obligation to give advice as to gaps in insurance? Your Honor, what actually happened here in the communications that he cites to is an invitation for further communication. We're not interested right now in what actually happened. We're interested in the pleading and inferences to be drawn from them. And he tells us, put to one side for a moment, the timing issue, which we can come back to. But he tells us that at some point, Marsh, in writing, offered to give advice on gaps if the client would simply make sure Marsh knew what the property was. So, Your Honor, it was an invitation for further communications, and even taking all reasonable inferences in his favor, he was asking to say, tell me about your assets, this is what we do as a broker, we talk to you, and then you as the insured decide what coverage to get. I didn't say that. It said we'll advise you. But brokers all the time advise, Your Honor. There's case law in Massachusetts, the First Circuit case, AGA Fishing Group versus Brown and Brown. In that case, it was another insured that had a boat. He was talking to his broker. The broker said, we are going to systematically review your coverage, comprehensively review your risk, and we're going to place insurance for you. And in that case, he got coverage. It wasn't sufficient to cover the loss. And the court said that the broker fulfilled its duties, because it spoke with the insured, it got the coverage requested, and it fulfilled its duties as a normal broker. That's what brokers do. They talk to their insured, and it's up to the insured to decide what coverage to actually get. Now, Your Honors, I want to turn... So, you paint this as a world as brokers, and then a very different universe of insurance advisors, and the broker can't become the latter? Sorry, Your Honor. The broker... There are situations where a broker takes on a fiduciary relationship, where they get intimately involved in the client's coverage. They help make decisions. They advise, is this insurance specific enough, adequate enough for your needs? That is not the typical relationship of a broker and an insured. It's not the relationship that's alleged in the complaint, Your Honor. And only in those situations can we look to whether the broker advised as to adequacy of coverage. But ordinarily, the broker meets with its insured, they discuss the risk, and then the insured decides what they want to place. Are they cost conscious? Do they care about premiums? Do they care about being risk adverse? But that's up to the insured to decide ordinarily, and there's nothing alleged in the complaint that would take this out of an ordinary relationship, Your Honor. Not counsel, but what... I mean, the complaint does allege this was a longstanding relationship. There were communications of the kind described in paragraph 17. Mr. Galakatos indicated to the broker a concern about gap in coverage. I think my point is, what is it as a matter of law that would preclude, given the allegations here, that there was a fiduciary relationship? It's not, you're quite right, that's not typically the broker-client relationship. But under special circumstances, it can become that kind of relationship. Why on the allegations here was the court entitled to conclude that as a matter of law, there could be no such relationship? Sure, Your Honor. So the fiduciary duty claim, there's one paragraph that he relies on to allege that this was a special relationship, and all he says is it was a longstanding special relationship. That's conclusory. That's spoiler plate. We know nothing about what gave rise to extra duties on the part of the broker. Being a longstanding relationship is not sufficient. A fiduciary relationship is only found in the extraordinary situation, and typically we know that when there's a special relationship, the broker gets extra compensation in addition to commissions, in addition to premiums that are paid to the insurance company. We know that the broker is talking to the insured about very complex placements, a lot of different placements. They're involved in all sorts of risks that the insured has. Here we have one paragraph, paragraph 54, that is boilerplate. It doesn't say anything about getting intimately involved in the insurance. And further, if you look to other paragraphs outside of the fiduciary duty claim, it actually precludes the finding of a special relationship because paragraph 23, it says that Mr. Gallicatos paid $35,000 in premium, and a broker just ordinarily only gets a percentage of that premium as a commission, Your Honor, but that is not extra fees for extra services. We know also that he, as Mr. Farrell said, he had not met with Mr. Gallicatos in years. He says that in paragraph 30. That is the opposite of a special relationship. He was not, Marsh was not intimately involved in this client's insurance risk. It just wasn't the situation. And so, again, there's a basic pleading standard that was not met here to allow the fiduciary duty claim to stand. Could you briefly address the timing issue? Yes, so as Your Honors pointed out, there is an issue with timing in this case. I think this case really boils down to paragraphs 17, 22, and 31. I mean, he refers to those paragraphs often in his briefs. Paragraph 17, as the district court correctly noted, is undated. We cannot have a contract without a date alleged. We have to know the duration, the date, and none of that is alleged in this paragraph. Paragraph 22, which he calls Keystone Paragraph, it's just a repeat of paragraph 17. And though it does sort of allege a date, assign a date to it, it says sometime before May 14, 2018, the Marsh defendants communicated in writing that they're going to talk to him about potentially eliminating gaps in coverage and have discussions with him. And they have this invitation. Again, it's not specific about the date or the duration, so it really cannot give rise to a contract claim. But even if we assign a date, Your Honor, it really is just an invitation to have further communications. We know that there's a case, Pero v. AIS Affinity. It's a Massachusetts Court of Appeals case that says that there has to be specifics about the obligations of either party. And we don't have dates here, and there's no specifics. And then finally, paragraph 31. It's very similarly worded to paragraph 17, but he assigns a date to it. And it's November 1, 2018. The accident was in September 2018, and the placements happened before that. It is unclear how a statement made after the fact could give rise to any sort of earlier duties. It just doesn't make sense. And in addition to that just not making sense, it's black letter law that when a broker is involved in procurement and the procurement is over, they have no further duties as an agent. So paragraph 31 just cannot stand and support any of his claims. Now, Your Honors, I just want to turn to the negligence claim, and we've touched on this very briefly. But as we've said and it's been talked about, a broker ordinarily just has to get the coverage that is requested of them. And that is absolutely what happened here. The Marsh defendants got the coverage that was asked of them, and that is why the negligence claim can't stand. Your Honors, we rest on our papers. I thank you, and if there's any other questions, I can answer them. But otherwise, we rest on our papers. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellant please reintroduce himself on the record? He has a one-minute rebuttal. David Farrell. Page 2 of the opinion says, sometime before 2018, the Court decided that that paragraph 17 had been sent. And it's certainly clear from paragraph 22, because I reference on May 14, 2018, Marsh was then obligated to carry out its paragraph 17 promise, which had to have occurred prior to May 14, 2018. It had to have been before the accident. Doesn't every broker or most brokers, like most sellers of most products, often tender and offer advice on what the client might buy and why the client might buy what the broker has to sell? This is on the page that discusses excess and primary policies, as I noted in paragraph 17 and 31. It's discussing what the excess is and what you have to do to get that. Identify the risk, and therefore, it will be eliminated by Marsh. Right, but when you go into a broker, don't they often say, well, what sort of house, who owns it, you and your spouse? Any special risks around? I think you should get this coverage, and you should really think about covering your auto. They give that sort of advice to every broker, don't they? But that's different from saying that we're going to eliminate the risk, or we're going to eliminate excess gaps. And that's what it says in that page, discussing excess and primary policies. It was sent out four or five times. Thank you. Thank you. Your time is up. Thank you, counsel. That concludes argument in this case.